# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **FRANCHESCA O'NEAL** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **VS.** | ) | Civil Action No.  SA-08-CA-1031-XR |
| | ) | |
| **ALAMO COMMUNITY COLLEGE** | ) | |
| **DISTRICT** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER

On this date, the Court considered Defendant Alamo Community College District ("ACCD")'s Motion for Final Summary Judgment (docket no. 18) on all of Plaintiff's claims and Defendant's supplemental Motion for Summary Judgment (docket no. 24).

Plaintiff filed this lawsuit against Defendant ACCD on December 30, 2008, based primarily on events surrounding her expulsion from ACCD.  Plaintiff's *pro se* Complaint alleges claims under § 1983 for (1) due process violations; (2) violation of the First Amendment's free exercise clause and free speech clause; and (3) state-law claims for defamation, intentional infliction of emotional distress, and (possibly) abuse of process.  Defendant ACCD moves for summary judgment on all claims.  It asserts that Plaintiff's claims are barred by the affirmative defense of res judicata, arguing that the state court's judgment in ACCD's lawsuit against O'Neal's precludes her claims in this action.  ACCD also asserts that Plaintiff's § 1983 claims fail on the merits.  On December 1, ACCD filed a supplemental motion for summary judgment, asserting that this Court's ruling in favor of Defendant Charles Falcon in the related case 08-CV-744 disposes of any vicarious liability claims against ACCD as Falcon's employer.  O'Neal has filed a response to the initial motion for summary judgment, but has not filed a response to the supplemental motion.

## I. Factual and Procedural Background

Plaintiff was a student in Professor Charles Falcon's Introduction to Public Speaking class

at ACCD in the Summer of 2008. Falcon refused to allow O'Neal to choose the topic of abortion for a speech assignment. Plaintiff has alleged that Falcon ridiculed and embarrassed her during her speech in retaliation for her questioning him about the restriction on the topic of abortion. She has also complained that he gave her a "B" instead of the "A" she deserved.

On July 1, 2008, Plaintiff filed suit in the 73rd District Court, Bexar County, against Falcon, alleging that he injured her reputation and seeking damages. Defendant Falcon filed special exceptions and, in response, Plaintiff filed an amended petition in state court on August 28, 2008. The amended petition asserted claims for constitutional violations, defamation, and intentional infliction of emotional distress. In addition, Plaintiff's amended petition contained language that Falcon and ACCD perceived as threatening. For example, she wrote,

> An alarming concern the defendant recklessly disregarded is that I am prior military. At the very least it is reasonable to assume that I can handle a sidearm and a semi-automatic assault rifle. I am not a sociopath and my mind is not ordinarily fragile enough to have a psychotic break and go on a killing spree, but there is no way he could have possibly foreseen that.

> Regardless, every person of sound mind has a breaking point; a limit to what they can tolerate under a given set of conditions and the law abiding student with an extremely hard head is not immune to a psychotic break and subsequent killing spree under the right wrong conditions. The defendant's actions simultaneously jeopardized the safety of everyone in the building because there is no reason for him to assume that I am incapable of responding to outrageous transgressions and no relief with an equally outrageous display of force in desperate measure to acquire some.

> As he said the first day of class, he has no idea what any student is capable of or not nor any indication of what any is willing to suffer. It is a dangerous and careless thing to play with the emotions of a person he does not know, because I am not playing. This is not included for shock value I am worried. Students do not throw toilet paper into trees or soap up windows anymore. They pull weapons out of backpacks and I for one do not want to find myself dodging bullets, or trying to find a way out of rubble because some irresponsible, jackass teacher did something stupid and pushed the wrong somebody too far.

Plaintiff's amended petition then went on to discuss how O'Neal felt that Falcon had retaliated against her for questioning him about his prohibition on the topic of abortion and undermining him in front of the class, and how he had misled her into believing that her speech was fine based on her

outlines.  She admitted that, in her second speech, she behaved inappropriately, and was then given an opportunity to give her speech to Jeff Hunt, head of the department.  She then wrote,

> What I know is that I was scared when I did my second speech with Prof. Hunt and that it was all I could do to maintain a semblance of self control.  In addition, when I see a gay, male, Hispanic, or hear vocals that are consistent with that demographic, I experience a knee-jerk reflex to shoot him whether there is anybody physically present or not.  The sensation, while transient, is intense.  Whatever my distress was, is, and will be considering this is far from over remains to be seen.  However, common sense suggests it is probably not good and the fact that I am hiding from it is cause for concern.

She continued, stating that what Falcon did to her was cruel, that he had exploited her fears and insecurities, and stated,

> I know that murder is a crime and I will not break the law, but if I could shoot the defendant dead within the limits of the law in exchange for every penny that I have asked for, I would shoot him dead and walk away penniless.  I would even be willing to let the B stand to blow the back of his head out.  That is a horrible way to feel, probably not a smart thing to admit either but so help me God it is the truth.  Feels better just saying so.

In response to the statements made in the amended petition, on September 3, 2008, ACCD filed a separate lawsuit in state court, 73rd Judicial District Court, Bexar County, seeking a temporary restraining order ("TRO"), temporary injunction, and a permanent injunction permanently enjoining Plaintiff from entering any ACCD campus.  ACCD quoted certain portions of the amended petition (and also attached the entire petition as an exhibit), and asserted that it was apparent from the amended petition that O'Neal was "unstable and violent and [had] directed her anger towards various students and teachers."

Later that day, during a television news interview, Plaintiff made additional statements that ACCD perceived as threatening, referencing Columbine and the Virginia Tech shootings.

In this lawsuit, Plaintiff asserts that she was not in fact threatening violence against Falcon or anyone, which she says is clear from the language and context of the petition (such as her statement that she would not break the law), and that ACCD quoted her out of context.  She states that she had three reasons for including this language in her amended petition: (1) to assert her claim; (2) to alert ACCD that it is not safe to mistreat people, because you never know how someone will

react, and thus actions like those of Falcon's put people at risk; and (3) for personal reasons, to process what had happened and move one. She contends that she included detailed allegations in her amended petition as she was required to do in response to Falcon's special exceptions, and that she delivered the amended petition to Falcon at school because he was refusing delivery at home and she did not know that she should serve it on Falcon's attorney. She asserts that ACCD's attorney, Bruce Spindler, is "crooked" and made unjustified accusations against her. Specifically, she asserts that he accused her of making a terroristic threat in an attempt to discredit her, and that if she had truly made a terroristic threat, she would have been criminally prosecuted.

On September 3, 2008, the state district court, the Honorable Lori Massey, issued an *ex parte* TRO restraining O'Neal from going within 500 feet of Falcon or any ACCD campus. The TRO stated that "[i]t appears to the Court that [O'Neal] is violent and has made terroristic threats and appears to be unstable and a danger to herself and/or others and will continue to communicate, threaten, and harass students, instructors, and/or representatives before notice can be given and a hearing is had on [ACCD's] motion for Temporary Injunction; and that if the commission of these acts are not restrained immediately, [ACCD] will suffer irreparable injury." That same day, O'Neal was removed from campus and withdrawn from her courses. She was given a reimbursement for the semester's tuition. The TRO order notified O'Neal of the temporary injunction hearing set for September 17 and ordered her to appear.

On September 10, Falcon removed O'Neal's state-court case against him to this Court, and the case was docketed as 08-CA-744-XR.

On September 17, the Honorable Joe Brown held a hearing on ACCD's motion for a preliminary injunction. O'Neal was present at the hearing and represented herself. She cross-examined witnesses, including Professor Hunt. She acknowledged the statements made in her amended petition, including that all people have a breaking point. However, she stated that she did not make any threats and was not responsible for others' interpretations or "misinterpretations." She further stated that she meant what she said about keeping the B in exchange for blowing the back of Falcon's head off. She testified that her statement regarding a knee-jerk response to shoot

homosexual Hispanic males[1] was not stating an intent to do that, but simply showing the effect Falcon's actions had had on her.

At the conclusion of the hearing, Judge Brown issued a temporary injunction order, finding that O'Neal was violent, had made terroristic threats, appeared to be unstable and a danger to others, and would continue to threaten instructors and/or representatives if not immediately restrained. Judge Brown stated that he found the statements in O'Neal's petition "alarming." He informed O'Neal at the hearing that his decision was based on the fact that O'Neal had testified that she had reached and exceeded her breaking point, had "popped [her] top" and was not immune from a psychotic break. Judge Brown concluded that O'Neal's statements and activity on campus, coupled with the fact that she meant her statement about blowing out the back of Falcon's head, warranted injunctive relief.

On October 27, 2008, ACCD informed O'Neal that she would receive a Due Process Review, and was notified that she should submit any written materials within two weeks. The review would include a review of written materials only, including the evidence presented at the temporary injunction hearing and the transcript of the hearing.

On November 17, 2008, ACCD President Robert Zeigler and Interim Executive Vice President Jessica Howard conducted the Due Process Review of ACCD's decision to withdraw O'Neal from her courses on September 3. The reason given for the disciplinary action was that O'Neal had violated the Student Code of Conduct by threatening and/or stating her desire to kill her teacher, and that the threats were made manifest through O'Neal in official documents and recordings submitted in the course of her lawsuit and by way of other public statements made outside the litigation to the media. The review concluded that the decision to withdraw O'Neal on September 3 was correct and prudent. The review panel also decided to expel O'Neal indefinitely from ACCD for violating the Student Code of Conduct by threatening and/or stating her desire to kill Falcon.

On November 21, 2008, a permanent injunction was issued against O'Neal in ACCD's lawsuit, and O'Neal's counterclaims alleging lack of due process were dismissed as moot or without

---

[1] O'Neal testified that Falcon is a gay, male Hispanic.

merit. The order issued by the state district court states,

> It appears to the Court that [O'Neal] is violent and has made terroristic threats and is unstable and a danger to herself and/or others, and has communicated, threatened, and harassed students, instructors, and/or representatives and that if the commission of these acts is not permanently restrained, [ACCD] will suffer irreparable injury. Franchesca O'Neal has made numerous statements both in her pleading and at ACCD that have caused the educational process at ACCD to be compromised. She has repeated some of these comments in news casts. The educational environment and process at ACCD has been adversely affected. Teachers have limited access to students as a direct result of the threats made by O'Neal. Students have expressed their concern by asking that classroom doors be locked. Education at ACCD is being adversely affected by O'Neal's conduct and her conduct is without any legal justification or right.

ACCD dismissed its claim for attorney fees, rendering the November 21, 2008 order final.

On January 12, 2009, this Court issued an Order in 08-CV-744 dismissing O'Neal's Fourteenth Amendment claim against Falcon based on a deprivation of due process stemming from her grade of "B." On May 8, 2009, this Court issued an Order in 08-CV-744 dismissing Plaintiff's defamation, Fourteenth Amendment deprivation of liberty (stigmatization) claims, intentional infliction of emotional distress claims against Falcon.

On July 23, ACCD moved for summary judgment in this action, asserting that all of Plaintiff's claims are barred by the res judicata effect of the state court proceedings and that her claims fail on the merits.

On October 27, 2009, this Court issued a final summary judgment in 08-CV-744 on Plaintiff's remaining First Amendment claims.

On December 1, 2009, ACCD filed a supplemental motion for summary judgment, asserting that the judgment in Falcon's favor in 08-CV-744 precludes any claims against it based on vicarious liability.

## II. Analysis

Plaintiff's Original Complaint asserts the following claims: (1) ACCD suspended Plaintiff "with absolutely none of the due process required by district policy and the US Constitution to protect her from unfair exclusion from the education process"; (2) ACCD deprived her of a liberty interest in the "way of the defamation of her reputation and standing in the community, under 42

U.S.C.S. section 1983, while attaching multiple illicit badges of infamy with no process and with no regard for the truth of the allegations, foreclosing the plaintiff's future educational and occupational opportunities, under false pretenses and for the purpose of retaliation in response to charges the plaintiff first brought against one of the professors, to interfere with her concentrated effort on that case by the plaintiff and alienate the plaintiff from what constituted her entire world excepting her mother"; (3) ACCD has deprived Plaintiff of federally granted vocational rehabilitation benefits without due process; (4) ACCD unlawfully infringed on Plaintiff's right to practice her religion without reprisal, in violation of section 1983; (5) ACCD deprived Plaintiff of her right to free speech; (6) intentional infliction of emotional distress; and (7) ACCD has committed these offenses in the process of abusing the Texas Rules of Civil Procedure with the assistance of the Bexar County Presiding Courts and in violation of the Texas Supreme Court's requirement of a showing of irreparable injury, with the consent of the Bexar County courts. Plaintiff seeks monetary damages and an order to "remove all derogatory and factually false notations from the plaintiff's student records.

**A. Due Process**

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." The threshold requirement of any due process claim is the government's deprivation of a plaintiff's liberty or property interest. *DePree v. Saunders*, 588 F.3d 282, 289 (5th Cir. 2009). In this case, O'Neal alleges that she was deprived of both property and liberty interests without due process.

Plaintiff makes a number of arguments in support of her claim, including that ACCD did not comply with the due process requirements for students for whom consent to remain on campus has been withdrawn, that the injunctive relief obtained by ACCD was illegitimate, that she was not informed of her right to an attorney, that she was denied a fair hearing, and that, had she been granted due process, she would have proved that she had not done anything illegal and never intended to do so. Before beginning its due process analysis, the Court must take some time to address some of the issues raised by Plaintiff and to establish the proper analytical framework.

First, it is important to note that, in determining whether Plaintiff was suspended and expelled without due process, the Court reviews the process that Plaintiff received to determine

whether it was constitutionally adequate, but does not review the correctness of the decisions reached by the state courts in the ACCD litigation apart from the due-process inquiry. The state district court issued a final judgment in ACCD's lawsuit, and certain aspects of the merits of that judgment (including whether the injunctive relief granted therein was illegitimate because ACCD failed to establish a threat of irreparable harm, as Plaintiff claims) cannot be reviewed in this court by way of a due process inquiry. Rather, the proper avenue for challenging the merits of the state court's judgment would have been by appeal of that judgment to the state appeals court.

Second, Plaintiff repeatedly argues that she did not make a terroristic threat, as that is defined by Texas Penal Code section 22.07. The allegations of terroristic threat were made in ACCD's litigation as part of its request for injunctive relief. However, O'Neal was not suspended and expelled for committing the crime of making a terroristic threat, but for violating the Student Code of Conduct. Accordingly, whether Plaintiff in fact made a terroristic threat in violation of the Penal Code is not directly at issue in the due process inquiry.

Third, Plaintiff cites to certain provisions of Texas Education Code chapter 51, subchapter E-1, which deals with "Maintaining Campus Order During Periods of Disruption." It defines a period of disruption as "any period in which it reasonably appears that there is a threat of destruction to institutional property, injury to human life on the campus or facility, or a threat of willful disruption of the orderly operation of the campus or facility," Tex. Educ. Code § 51.231, and provides that, during a period of disruption, certain administrators may notify a person that consent to remain on the campus or facility has been withdrawn whenever there is reasonable cause to believe that the person has willfully disrupted the orderly operation of the campus or facility and that his presence on the campus or facility will constitute a substantial and material threat to the orderly operation of the campus or facility. *Id.* § 51.233. It requires written notice, *id.* § 51.234, and a right to a hearing if requested, *id.* § 51.237. Section 51.243 provides that "[a] person from whom consent to remain on the campus of a state-supported institution of higher education has been withdrawn in accordance with Section 51.233 is entitled, in addition to the procedures set out in Section 51.234, to the following: (1) to be represented by counsel; (2) to the right to call and examine witnesses and to cross-examine adverse witnesses; (3) to have all matters upon which the decision may be based introduced into evidence at the hearing in his presence; (4) to have the decision based solely on the

evidence presented at the hearing; (5) to prohibit the introduction of statements made against him unless he has been advised of their content and the names of the persons who made them, and has been given the opportunity to rebut unfavorable inferences that might otherwise be drawn; and (6) to have all findings made at the hearing be final, subject only to his right to appeal to the president and the governing board of the institution." Further, under § 51.241 ("Students and Employees Barred From Campus After Suspension or Dismissal"), "[e]very student or employee who has been suspended or dismissed from a state-supported institution of higher education after a hearing, in accordance with procedures established by the institution, for disrupting the orderly operation of the campus or facility of the institution, as a condition of the suspension or dismissal, may be denied access to the campus or facility, or both, of the institution for the period of suspension, and in the case of dismissal, for a period not to exceed one year."

Plaintiff contends that, though this chapter gives her a right to an attorney, she was not informed of this right, and this violated due process. She also argues that she was denied the right to present evidence of her innocence, denied the right to confront her accusers, denied the right for the ruling to be based on actual evidence, and denied the right to a hearing.

Section 51.240 expressly provides that subchapter E-1 "does not affect the power of the duly constituted authorities of a state-supported institution of higher education to suspend, dismiss, or expel any student or employee at the university or college." Though these provisions could have been utilized and applied to Plaintiff, it does not appear that they were, nor were they required to be. Plaintiff was not suspended or dismissed "for disrupting the orderly operation of the campus or facility of the institution." Rather, she was suspended and expelled for violating the Student Code of Conduct, specifically by threatening and expressing her desire to kill Falcon. Under section 51.240, nothing in subchapter E-1 affects the power of ACCD to suspend or expel Plaintiff for such a violation. Moreover, due process is a matter of federal constitutional law, and failure to comply with state procedures does not, by itself, violate due process.

The Court will therefore consider only whether the procedures utilized in the suspension and expulsion satisfied the constitutional requirements for due process. As the Sixth Circuit has explained, "We understand the seriousness and the lifelong impact that expulsion can have on a young person as well as the significant financial costs already incurred. Our review of this matter,

however, is circumscribed. We are limited to determining whether the procedures used by [the university] were constitutional." *Flaim v. Medical College of Ohio*, 418 F.3d 629, 638 (6th Cir. 2005). Due process does not "ensure that the academic disciplinary process is a 'totally accurate, unerring process.'" *Nash v. Auburn Univ.*, 812 F.2d 655, 660 (11th Cir. 1987) (quoting *Goss v. Lopez*, 419 U.S. 565, 579-80 (1975)); *see also Clarke v. Univ. of N. Tex.*, 993 F.2d 1544 (5th Cir. 1993) ("Procedural due process rights do not guarantee a particular outcome to a disciplinary proceeding but only assure that it is fairly conducted."). The Court thus turns to the due process inquiry.

### 1. Deprivation of right to education (suspension and expulsion)

Defendant moves for summary judgment on this claim, arguing that Plaintiff received all process that was due.

As noted, a threshold requirement for Plaintiff's due process claim is the deprivation of a protected property or liberty interest. Property interests are not created by the Constitution, but are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985). Property interests in public elementary and secondary education have been recognized based on state constitutional guarantees to an appropriate free public education, as was the case in *Goss v. Lopez*. But *Goss v. Lopez*, 419 U.S. 565 (1975), does not establish a right to a university education. The Texas Supreme Court has not decided whether students have a property interest in their education at tax-funded state universities, but it has recognized a liberty interest in such education. *Univ. of Tex. Medical Sch. v. Than*, 901 S.W.2d 926, 930 & n.1 (Tex. 1995) ("We hold that Than has a constitutionally protected liberty interest in his graduate education that must be afforded procedural due process."). The Fifth Circuit has likewise recognized this liberty interest, and held that due process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct. *Dixon v. Alabama State Bd. of Educ.*, 294 F.2d 150 (5th Cir. 1961).[2]

---

[2] Specifically, the Court held that the "precise nature of the private interest involved in this case is the right to remain at a public institution of higher learning in which the plaintiffs were students in good standing. It requires no argument to demonstrate that education is vital and, indeed,

The Court provided specific guidelines on the nature of the notice and hearing required by due process prior to expulsion from a state college or university:

> The notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion under the regulations of the Board of Education. The nature of the hearing should vary depending upon the circumstances of the particular case. The case before us requires something more than an informal interview with an administrative authority of the college. By its nature, a charge of misconduct, as opposed to a failure to meet the scholastic standards of the college, depends upon a collection of the facts concerning the charged misconduct, easily colored by the point of view of the witnesses. In such circumstances, a hearing which gives the Board or the administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved. This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required. Such a hearing, with the attending publicity and disturbance of college activities, might be detrimental to the college's educational atmosphere and impractical to carry out. Nevertheless, the rudiments of an adversary proceeding may be preserved without encroaching upon the interests of the college. In the instant case, the student should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies. He should also be given the opportunity to present to the Board, or at least to an administrative official of the college, his own defense against the charges and to produce either oral testimony or written affidavits of witnesses in his behalf. If the hearing is not before the Board directly, the results and findings of the hearing should be presented in a report open to the student's inspection. If these rudimentary elements of fair play are followed in a case of misconduct of this particular type,[3] we feel that the requirements of due process of law will have been fulfilled.

---

basic to civilized society. Without sufficient education the plaintiffs would not be able to earn an adequate livelihood, to enjoy life to the fullest, or to fulfill as completely as possible the duties and responsibilities of good citizens." *Dixon*, 294 F.2d at 157. Other courts have also recognized a liberty interest in public university education. *See, e.g.*, *Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 14 (1st Cir. 1988) (recognizing that "[t]he interests of students in completing their education, as well as avoiding unfair or mistaken exclusion from the educational environment, and the accompanying stigma are, of course, paramount."); *Zwick v. Regents of Univ. of Mich*, Civ. A. No. 06-12639, 2008 WL 1902031 at *4 (E.D. Mich. April 28, 2008) (listing cases recognizing a property or liberty interest in public university education).

[3] The Court noted that the exact nature of the misconduct was not specified, but it appeared that the expelled students were African-American students who demanded to be served at a whites-only lunch grill located in the Montgomery County courthouse.

*Dixon*, 294 F.2d at 158-59.[4]

Soon after *Dixon*, the Supreme Court in *Goss v. Lopez*, 419 U.S. 565 (1975), confirmed that oral or written notice of the charges and an opportunity for a hearing are required, even for suspensions. *Goss* did not require a formal hearing before suspension, but only an "'informal give-and-take' between the student and the administrative body dismissing him that would, at least, give the student 'the opportunity to characterize his conduct and put it in what he deems the proper context." *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 86 (1978). However, students facing a more serious deprivation, such as expulsion, may be entitled to "more formal procedures." *Pugel v. Bd. of Trustees of Univ. of Illinois*, 378 F.3d 659, 664 (7th Cir. 2004); *Univ. of Texas Medical Sch. v. Than*, 901 S.W.2d 926, 931 (Tex. 1995). Thus, for tax-supported university students facing expulsion, due process generally requires notice of the specific charges and grounds which, if proven, would justify expulsion, and a hearing.

Further, due process generally requires that the "notice and hearing should precede removal of the student from school." *Goss*, 419 U.S. at 158; *see also Zinermon v. Burch*, 494 U.S. 113, 127 (1990) ("[T]he Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property.") (emphasis in original). However, due process "is a flexible concept that varies

---

[4] Plaintiff complains that she was not informed of her right to counsel. She appears to glean this right from the Texas Education Code provisions discussed *supra*. However, the Court has concluded that those provisions are not applicable, and courts have held that students facing disciplinary proceedings do not have a right to counsel. *See, e.g.*, *Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 16 (1st Cir. 1988) ("[T]he weight of authority is against representation by counsel at disciplinary hearings, unless the student is also facing criminal charges stemming from the incident in question."). Accordingly, Plaintiff's due process rights were not violated by the Defendant's failure to inform her of her right to counsel. In any event, Plaintiff has stated that she could not have afforded to hire counsel even if she had been aware of the right, and thus it does not appear that the failure to inform her of the right to counsel prejudiced her rights.

with the particular situation." *Zinermon*, 494 U.S. at 127. Court must apply a flexible standard that depends on the practical requirements of the circumstances. *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). This flexible standard includes three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Id.* at 335. Plaintiff has a significant interest in her education and reputation. *Dixon*, 294 F.2d at 157. However, the government's interests in protecting students and staff, deterring violent acts, and reducing fear caused by threats of violence are "compelling" and "powerful." *Milligan v. City of Slidell*, 226 F.3d 652, 655 (5th Cir. 2000) (school's interests in protecting its students, fostering self-discipline, and deterring possibly violent misconduct are "compelling governmental interests"); *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 623 n.58 (5th Cir. 2004) (recognizing the "the powerful interest of promoting school safety").

Recognizing this flexible standard, the Supreme Court in *Goss v. Lopez* expressly noted "that there are recurring situations in which prior notice and hearing cannot be insisted upon. Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school. In such cases, the necessary notice and rudimentary hearing should follow as soon as practicable...." *Goss*, 419 U.S. at 582; *see also Zinermon*, 494 U.S. at 128 (noting that, in some circumstances, a post-deprivation hearing may satisfy due process, even for deprivations of liberty interests).

In this case, as discussed more fully below, ACCD officials reasonably perceived the

statements in Plaintiff's amended petition to be threats against Falcon personally. In addition, some of her references to students bringing guns to school and "dodging bullets" could have been reasonably perceived as threats against the entire college student and staff population.[5] Thus, attempting to protect Falcon and the college in general, ACCD sought an immediate TRO preventing Plaintiff from coming on any ACCD campus. Plaintiff was not given notice or an opportunity to appear at the TRO hearing. However, rather than unilaterally suspending Plaintiff based on the perceived threats, ACCD presented its case to an impartial judge and obtained a TRO before it withdrew Plaintiff from her classes based on the statements in her amended petition. The state district judge determined that, based on Plaintiff's statements in the amended petition, Plaintiff posed an immediate threat and the TRO was warranted.[6] Applying the flexible balancing test, the Court finds that due process was not violated.

Plaintiff was then given notice of the temporary injunction hearing, which occurred within two weeks after she was withdrawn from her classes. The temporary injunction hearing was conducted by Judge Joe Brown. Plaintiff received notice of the hearing and its purpose, was present at the hearing, and was given an opportunity to testify and cross-examine witnesses. Though Plaintiff did not agree with the ultimate outcome of the hearing and Judge Brown's findings that

---

[5] The nature of Plaintiff's speech is discussed more fully below, in the discussion of Plaintiff's First Amendment claims.

[6] Plaintiff complains that the TRO was not justified because it was issued two months after the actual conflict between Plaintiff and Falcon, and there had been no problems during that time. However, ACCD sought the TRO in response to the perceived threats in the amended complaint, which Plaintiff had filed just days before. Further, ACCD appropriately responded to the perceived threats, which were recently made, even though the threats were the result of a conflict that had occurred two months prior. The fact that O'Neal had not acted on a violent impulse during that two-month period did not negate that fact that ACCD reasonably perceived her to pose a threat based on her language in the amended complaint.

Plaintiff was violent, had made terroristic threats, and appeared to be unstable and a danger to others, the hearing itself was fair and complied with due process. Plaintiff's ultimate expulsion from ACCD was based on the Due Process Review conducted by the University President and Interim Executive Vice President, and was based on a review of written evidence, including the temporary injunction proceedings. The Court finds this review reasonable, given that school administrators believed Plaintiff to be a threat and a state district judge had found Plaintiff to pose a threat, thus curtailing the feasibility of a live hearing at which Plaintiff would be present. In addition, Plaintiff admitted at the temporary injunction hearing that she made the statements, and that she meant them. Whether a student "admitted the charges" leveled against her is "relevant in determining substantial prejudice or harm." *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 624 (5th Cir. 2004). "This is so because one of the primary purposes of expulsion hearings is that of confirming whether the student threatened with expulsion actually committed the conduct for which he is being punished. Once a student has admitted his guilt, the need for a hearing is substantially lessened." *Id.* Again, applying the flexible balancing test, the Court finds that Plaintiff's due process rights were not violated with regard to her expulsion from ACCD.

The Court acknowledges Plaintiff's repeated assertions that she did not make a threat and that she had no intention of causing harm. However, whether Plaintiff's statements were a threat has already been decided by the state court after notice and a hearing, and that finding has certain preclusive effects. Further, courts have routinely concluded that schools "must be entitled to take effective preventive action when evidence surfaces of an individual" with possible violent intentions. *See Mora v. City of Gaithersburg*, 519 F.3d 216, 223 (4th Cir. 2008). "This is the lesson of a variety of recent school cases in which students have made Columbine-style threats, been suspended or

expelled, and then sued – cases which have almost uniformly been decided in defendant's favor." *Id.* "Our recent history demonstrates that threats of an attack on a school and its students must be taken seriously." *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 771 (5th Cir. 2007). "School administrators must be permitted to react quickly and decisively to address a threat of physical violence against their students, without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a real risk of substantial disturbance." *Id.* at 772. Even where threats are not express or direct, but are merely intimated, administrators must be able to respond in "emergency mode" to a credible threat of mass homicide. *Mora*, 519 F.3d at 226. Thus, because school administrators must be given leeway to react to student behavior that can be reasonably perceived as threatening, immediate removal from the school premises before notice and a hearing is a reasonable response, as long as notice and a hearing follow as soon as practicable. *See, e.g.*, *Nguyen v. Univ. of Louisville*, Civ. A. No. 3:04-CV-457-H, 2006 WL 1005152 (W.D. Ky. April 14, 2006); *Dvoret v. Maricopa County Comm. College*, Civ. A. No. 03-2133, 2006 WL 1600132 (D. Ariz. June 5, 2006) ("Although plaintiff was suspended prior to holding a hearing, case law on this question has endorsed pre-hearing suspensions for 'students whose presence poses a continuing danger to person or property or an ongoing threat of disrupting the academic process.'").

Plaintiff was given due process in the form of notice, the temporary injunction hearing, an opportunity to respond to ACCD's motion for final summary judgment on the permanent injunction, as well as a Due Process Review by neutral administrators at ACCD. Though Plaintiff's interest in not being suspended and expelled is significant, ACCD's interest in protecting its faculty and students from a perceived threat of violence is compelling, and the procedures utilized did not create

an unacceptable risk of an erroneous deprivation. Considering all the circumstances and the findings of the state court, the Court finds that Plaintiff received constitutionally adequate due process with regard to her withdrawal/suspension and expulsion.

Plaintiff also complains that she has been deprived of her right to federal vocational rehabilitation benefits, which were available to her, but could not be used by her due to her inability to continue her education. There is no indication that ACCD has in any way directly interfered with or deprived Plaintiff of these benefits; rather, she is apparently deprived of these benefits as a by-product of her suspension and expulsion. Accordingly, this claim must fall with Plaintiff's due process claim related to her suspension and expulsion.

### 2. Due Process – reputation

Plaintiff contends that she was deprived of a liberty interest in her reputation without due process. This claim appears to stem from the ACCD litigation, in which ACCD and its attorneys accused Plaintiff of making a terroristic threat, in violation of Texas Penal Code § 22.07. Plaintiff claims that the accusation was unjustifiable, and that ACCD itself broadcast the accusation and created fear. However, the Fifth Circuit has held that there is "no support for the proposition that reputation alone, apart from some more tangible interests ... is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Parker v. Duffey*, 251 Fed. App'x 879, 883 (5th Cir. 2004) (holding that injury to student's reputation alone was insufficient to state due process claim). Thus, Fifth Circuit precedent is clear that Plaintiff's claim for damage to reputation alone cannot survive, and summary judgment is granted on this claim.

### B. First Amendment

The Court has concluded in the related litigation, 08-CV-744, that Plaintiff's First

Amendment rights were not violated by Falcon's refusal to allow her to choose the topic of abortion for her speech, and has also granted summary judgment on her First Amendment retaliation claim against Falcon. Thus, to the extent these same claims form the basis of Plaintiff's claims against ACCD, they must fail because there is no constitutional violation.[7]

However, Plaintiff asserts additional First Amendment claims based on the conduct of ACCD itself. "[T]he First Amendment prohibits not only direct limitations on speech but also adverse government action against an individual because of her exercise of First Amendment freedoms." *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999). Plaintiff claims that ACCD retaliated against her for her exercise of free speech. The Supreme Court has held that a state university cannot expel a student in retaliation for engaging in activity protected by the First Amendment. *See Papish v. Board of Curators of the Univ. of Mo.*, 410 U.S. 667, 669-71 (1973). In order to establish a retaliation claim cognizable under the First Amendment, the plaintiff student must prove that her speech was constitutionally protected and that it was a "substantial" or "motivating" factor in the challenged decision. *See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *see also McGee v. Schoolcraft Community College*, 167 Fed. App'x 429 (6th Cir. 2006) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)); *Garcia v. S.U.N.Y. Health Sciences Ctr.*, 280 F.3d 98, 106-07 (2d Cir. 2001).

The Court thus turns to the first element of O'Neal's claim – whether her speech was constitutionally protected. There are certain well-defined and narrowly limited classes of speech or

---

[7] ACCD's supplemental motion for summary judgment asserts that it is entitled to summary judgment to the extent it could be held vicariously liable for Falcon's actions. However, section 1983 does not permit recovery on a theory of vicarious liability. But the Court's finding that no constitutional violation occurred does preclude liability on the part of ACCD based on the same alleged constitutional violation, and thus ACCD's motion is granted in that regard.

expressive conduct that the courts have long permitted the government to regulate or proscribe, despite the protections of the First Amendment. In this regard, the Supreme Court has long recognized that the Constitution permits government to proscribe "true threats." *See Virginia v. Black*, 538 U.S. 343, 360 (2003) (citing *Watts v. United States*, 394 U.S. 705, 708 (1969)); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992) ("[T]hreats of violence are outside the First Amendment"). "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 U.S. at 360. Thus, in any context, a true threat is not protected by the First Amendment.

As the Fifth Circuit noted in *Porter v. Ascension Parish School Board*, 393 F.3d 608 (5th Cir. 2004), when discussing the applicable standard for student speech perceived as threatening:

> As a general rule, the First Amendment prohibits government actors from 'dictating what we see or read or speak or hear. However, the government can proscribe a true threat of violence without offending the First Amendment. Speech is a "true threat" and therefore unprotected if an objectively reasonable person would interpret the speech as a 'serious expression of an intent to cause a present or future harm. The protected status of the threatening speech is not determined by whether the speaker had the subjective intent to carry out the threat; rather, to lose the protection of the First Amendment and be lawfully punished, the threat must be intentionally or knowingly *communicated* to either the object of the threat or a third person.

*Id.* at 616. "In determining whether a statement amounts to an unprotected threat, there is no requirement that the speaker intended to carry out the threat, nor is there any requirement that the speaker was capable of carrying out the purported threat of violence." *Doe v. Pulaski County Special Sch. Dist.*, 306 F.3d 616, 624 (8th Cir. 2002). A threat does not even have to be logical or based in

reality before the government may punish someone for making it. *Id.* at 624 n.3.[8] "A prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,'" in addition to protecting people 'from the possibility that the threatened violence will occur.'" *Black*, 538 U.S. at 360.

More recently, in *Ponce v. Socorro Independent School District*, 508 F.3d 765 (5th Cir. 2007), the Fifth Circuit addressed the question "whether student speech that threatens a Columbine-style attack on a school is protected by the First Amendment" and concluded that it was not. The Court found that a high school student's "notebook diary," which detailed a Columbine shooting attack on his high school (and which the student claimed was a work of fiction) was threatening the student population and was not protected by the First Amendment. The Court noted that "[o]ur recent history demonstrates that threats of an attack on a school and its students *must* be taken seriously." *Id.* at 771. The Court noted that the student contended that the writings "were mere fiction and posed no real threat," but held that it was reasonable for school officials "to conclude that failing to respond to [the student's] diary would not only place [the student] and other students at risk of physical danger if the intent expressed in the diary was actualized, but would also send a message to [the student] and to the informing student that the school administration would tolerate violent threats against the student body." *Id.* at 771 n.3. In holding that speech threatening a school

---

[8] Plaintiff repeatedly states that she had no intent to harm Falcon or anyone else, and that she made this clear in the amended petition. The Court has no reason to doubt Plaintiff's sincerity in that regard. However, whether she intended to carry out the threat is not the relevant inquiry. Further, Plaintiff vehemently takes issue with the state court's conclusion that she posed an actual threat, noting that she is small and suffers from decreased lung capacity. However, as Plaintiff herself pointed out in the amended petition, she is familiar with firearms, and as she herself notes, she could run over Falcon with a car. Thus, her size or lung capacity would not render the perceived threat unrealistic to ACCD.

or its population is unprotected by the First Amendment, the Court expressly noted that the "heightened vulnerability of students arising from the lack of parental protection and the close proximity of students with one another make schools places of 'special danger to the physical safety of the student" and "it is this particular threat that functions as the basis for restricting the First Amendment in schools." *Id.* at 770.

The Court drew a distinction between speech that "poses a direct threat to the physical safety of the school population" and "threats of violence to individual teachers," finding that the former should be analyzed under the recent standard set forth in *Morse v. Frederick*, while the latter should be analyzed under the traditional standard for student speech established in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 502 (1969). Violent speech "aimed at specific persons" was addressed in two cases cited by the Fifth Circuit in *Ponce – Boim v. Fulton County School District*, 494 F.3d 978 (11th Cir. 2007) and *Wisniewski v. Board of Education of the Weedsport Central School District*, 494 F.3d 34 (2d Cir. 2007).

In *Wisniewski*, the court dealt with an eighth-grade student's computer-generated icon depicting his teacher being shot. It concluded that the "true threat" standard was not applicable to student speech, instead finding that "school officials have significantly broader authority to sanction student speech" than that standard allows, and that "[w]ith respect to school officials' authority to discipline a student's expression reasonably understood as urging violent conduct," the appropriate First Amendment standard is the one set forth in *Tinker*. *Wisniewski*, 494 F.2d at 38. The court then held that the creation and transmission of the computer-generated icon, even though it occurred away from school property, "crosse[d] the boundary of protected speech and constitute[d] student conduct that pose[d] a reasonably foreseeable risk that the icon would come to the attention of school

21

authorities and that it would 'materially and substantially disrupt the work an discipline of the school." *Id.* "For such conduct, *Tinker* affords no protection against school discipline." *Id.*

In *Boim*, a high school student was suspended after she wrote a story about a dream of shooting her teacher. The court found the speech to be unprotected because it could reasonably be construed as a threat of physical violence against the student's teacher and created an appreciable risk of disrupting the school. The Court applied a standard requiring that the student speech must at least "be likely to cause a material and substantial disruption and more than a brief, easily overlooked, *de minimis* impact, before it may be curtailed," and held that student expression may be regulated when doing so "contributes to the maintenance of order and decorum within the educational system." *Boim*, 494 F.3d at 983 (citing *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)).

While instructive, *Ponce*, *Wisniewski*, and *Boim* all involved student speech of minors, not speech by an adult in the context of a public university setting such as this one. "[T]here is a difference between the extent that a school may regulate student speech in a public university setting as opposed to that of a public elementary or high school." *DeJohn v. Temple University*, 537 F.3d 301, 315 (3d Cir. 2008). "[T]here are very important differences between primary and secondary schools, on the one hand, and colleges and universities, on the other. As the courts often have acknowledged, the state does not require higher education and has much less interest in regulating it, the students in colleges and universities are not children, but emancipated (by law) adults, and, critically, the mission of institutions of higher learning is quite different from the mission of primary and secondary schools." *College Republicans v. Reed*, 523 F. Supp. 2d 1005, 1015 (N.D. Cal. 2007). Thus, "state colleges and universities are not enclaves immune from the sweep of the First

Amendment." *Healy v. James*, 408 U.S. 169, 180 (1972). Rather, "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher learning]." *Id.*

Because O'Neal is an adult attending college, and the speech occurred off-campus (though O'Neal admits to delivering a copy of the amended complaint to Falcon at the campus), the Court concludes that the "true threat" standard of *Watts* should provide the applicable framework rather than the less protective standards utilized by the courts in the context of primary and secondary school student speech.

Based on the summary-judgment evidence and considering the totality of the circumstances, the Court finds that the statements O'Neal included in her amended petition constituted a "true threat" such that they are not protected by the First Amendment under the *Watts* standard. As noted, whether speech constitutes a "true threat" is not determined by the intent of the speaker, but is determined by the viewpoint of a reasonable recipient. In issuing the temporary restraining order, which was based solely on the statements made in O'Neal's amended petition, the state district court concluded that Plaintiff's statements in her amended petition were a serious expression of an intent to do harm. The state judge made the same finding when issuing the temporary and permanent injunctions. Further, when deciding to expel O'Neal, ACCD was also aware of O'Neal's statements made to the news media, referencing Columbine and Virginia Tech. The Court notes that, O'Neal chastises Falcon for failing to consider the fact that a student faced with "the right wrong" circumstances might resort to violence, but then argues that ACCD and the courts could not and should not have taken her speech as truly threatening. Unfortunately, whether she intended to harm anyone or not, the case law makes clear that school administrators must take such speech seriously

and react accordingly.

Because O'Neal's speech constituted a "true threat," she did not engage in protected speech, and ACCD did not violate Plaintiff's First Amendment rights by initiating disciplinary action based on the perceived threats, and did not violate her rights by obtaining the TRO, suspending her, and eventually expelling her. Accordingly, summary judgment is granted in favor of ACCD on Plaintiff's free speech claims.

Further, Plaintiff has failed to raise a material issue of fact with regard to her claim that ACCD infringed her right to the free exercise of her religion. Plaintiff has introduced no evidence to show that ACCD in any way prevented her from exercising her religious beliefs. Accordingly, summary judgment is granted on this claim as well.

## C. Defamation

The elements of a defamation cause of action for a private individual are (1) publication of a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with negligence regarding the truth of the statement. *WFAA TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex.1998). Plaintiff's defamation claim appears to be based on ACCD's accusing her of making a "terroristic threat" in the course of obtaining injunctive relief against her. However, Texas has long recognized a litigation privilege, which does not permit actions for defamation based on statements made during the course of litigation:

> "Any communication, oral or written, uttered or published in the due course of a judicial proceeding is absolutely privileged and cannot constitute the basis of a civil action in damages for slander or libel." *Reagan v. Guardian Life Ins. Co.*, 166 S.W.2d 909, 912 (Tex. 1942) (citations omitted). "This privilege extends to any statement made by the judge, jurors, counsel, parties or witnesses, and attaches to all aspects of the proceedings, including statements made in open court, pre-trial hearings, depositions, affidavits and any of the pleadings or other papers in the case."

> *James v. Brown*, 637 S.W.2d 914, 917-18 (Tex. 1982). The law allows absolute privilege or immunity for a communication because of the occasion in which it is made. *Reagan*, 166 S.W.2d at 913. The rule is one of public policy "founded on the theory that the good it accomplishes in protecting the rights of the general public outweighs any wrong or injury which may result to a particular individual." *Id.*

*Jenevein v. Freedman*, 114 S.W.3d 743, 745-46 (Tex. App.–Dallas 2003, no pet.). Accordingly, summary judgment is appropriate on Plaintiff's defamation claim.

## D. Intentional Inflictation of Emotional Distress

To recover damages for intentional infliction of emotional distress, a plaintiff must establish that (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Hoffmann-La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004). Extreme and outrageous conduct is conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* ( quoting *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993)). Whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery for intentional infliction of emotional distress is a question of law. *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex. 1993). While the Court has no doubt that ACCD's actions in this case have caused Plaintiff emotional distress, the Court finds that ACCD's actions were not extreme and outrageous as a matter of law. Rather, as discussed herein, ACCD's action were reasonable responses to a perceived threat. Summary judgment is granted in favor of ACCD on this claim.

## E. Abuse of Process

Defendant reads Plaintiff's complaint as asserting an abuse-of-process claim. It is not clear

that she is alleging such a claim apart from her assertion that the injunctive relief was improperly issued by the state courts. However, the Court will address the claim. A claim for abuse of process requires (1) an illegal, improper, or "perverted" use of the process, neither warranted nor authorized by the process, (2) an ulterior motive or purpose in exercising such use, and (3) damages as a result of the illegal act. *Martinez v. English*, 267 S.W.3d 521, 528 (Tex. App.–Austin 2008, pet. denied) (citing *Preston Gate, LP v. Bukaty*, 248 S.W.3d 892, 897 (Tex.App.–Dallas 2008, no pet.)). The "critical aspect" of an abuse of process claim is the improper use of the process after it has been issued. *Id*. In other words, abuse of process applies to a situation where a properly issued service of process is later used for a purpose for which it was not intended. *Id.* at 528-29. There is no evidence that process was used illegally or improperly after it was issued, and thus this claim fails as a matter of law.

## Conclusion

Defendant ACCD's Motion for Summary Judgment (docket no. 18) and Supplemental Motion for Summary Judgment (docket no. 24) are GRANTED. This Order disposes of all claims and the Clerk's Office is directed to enter judgment accordingly and to close this case.

It is so ORDERED.

SIGNED this 27th day of January, 2010.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE